[Cite as *State v. Fields*, 2014-Ohio-301.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99750**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# KURTIS FIELDS

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-559057

**BEFORE:** E.T. Gallagher, J., Boyle, A.J., and McCormack, J.

**RELEASED AND JOURNALIZED:** January 30, 2014

**ATTORNEYS FOR APPELLANT**

Susan J. Moran
55 Public Square, Suite 1616
Cleveland, Ohio 44113

Robert L. Tobik
Cuyahoga County Public Defender

BY:    Erika B. Cunliffe
Assistant Public Defender
310 Lakeside Avenue, Suite 200
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:    Erin Stone
       T. Allan Regas
Assistant Prosecuting Attorneys
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN T. GALLAGHER, J.:

{¶1} Defendant-appellant, Kurtis Fields ("Fields"), appeals his having a weapon while under disability conviction. We find no merit to the appeal and affirm.

{¶2} Fields was charged with one count of attempted murder, two counts of felonious assault, and one count of having a weapon while under disability. The attempted murder and felonious assault charges included one- and three-year firearm specifications. The felonious assault charges included a notice of prior conviction and repeat violent offender specifications. The case proceeded to a jury trial on all counts except for the having a weapon while under disability, which was tried to the court.

{¶3} The victim, Rasul Bryant ("Bryant"), testified at trial that he was shot at approximately 2:30 a.m. on January 20, 2012, as he was leaving Club Generation, a strip club. At 12:00 a.m., Bryant and his friend B.J. shared a pint of vodka and a marijuana cigarette before meeting friends at the club to celebrate a friend's birthday. Bryant consumed another four or five vodkas at the club and was intoxicated when it closed at 2:30 a.m.

{¶4} Before leaving the club, Bryant had observed some of his friends arguing with another group of patrons at the club, including Fields. The incident caught his attention because it appeared as though the argument was escalating into a physical fight. Bryant later observed Fields slap one of Bryant's female friends on the buttocks shortly before the club closed.

{¶5} When Bryant and B.J. exited the club at closing time, they once again encountered Fields in the parking lot. Bryant and B.J. entered their car and were ready to leave but Fields was pacing in front of their car. Bryant testified that he felt uneasy about Fields's behavior and that they separately asked Fields if he was alright. He replied to each of them, "Yeah man, you all cool." However, when B.J. started driving out of the parking lot, Bryant observed Fields hide behind the passenger door of a black van and fire a gun at their car. Several bullet holes penetrated the car, and Bryant sustained a gunshot wound to his right posterior thigh. The bullet traveled through his abdomen, fractured his pelvis, and perforated his bladder and bowel. B.J. drove Bryant to MetroHealth Medical Center where he was treated for his injuries.

{¶6} Cleveland police obtained a description of three suspects and their vehicle from two witnesses at the scene and began a citywide search. Officer Andrew Gibb ("Gibb") testified that he responded to a gas station located at the corner of East 55th Street and Woodland Avenue because it has a 24-hour fast food restaurant and is known to attract large crowds after the bars close. Gibb observed a tall black male standing next to an early model Yukon Denali that matched the descriptions of one of the suspects and the vehicle. Police questioned the suspect, who identified himself as Fields. Fields admitted that he had come from Club Generation and that he left the club at closing time. Both Fields and his companions denied that any shooting occurred at the club, and no weapons were found in their vehicle. Police nevertheless arrested Fields on an unrelated outstanding warrant.

{¶7} A few days later, on January 24, 2012, Detective Gregory Cook ("Det. Cook") visited Bryant in the hospital and presented him with three separate photo arrays each containing six photographs of potential suspects. Although Bryant was medicated for pain relief, Det. Cook testified that he was coherent and did not seem to be impaired. Bryant immediately identified Fields as the shooter from the first lineup. The two other suspects were depicted in the other two "six packs" of photos.

{¶8} At the conclusion of the trial, the jury returned a not guilty verdict on all charges. However, the court found Fields guilty of having a weapon while under disability and sentenced him to 36 months in prison. Fields now appeals and raises three assignments of error.

## Photo Array

{¶9} In the first assignment of error, Fields argues the trial court abused its discretion in allowing Bryant's photo array identification into evidence at trial. He contends that because the Cleveland police failed to use a "folder system," as defined in R.C. 2933.83(A), the photo array was unnecessarily suggestive and unreliable.

{¶10} An identification derived from unnecessarily suggestive procedures, which have a likelihood of leading to a misidentification, violates a defendant's right to due process. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The defendant bears the burden of demonstrating that the identification procedures were unnecessarily suggestive. *State v. Quarterman*, 8th Dist. Cuyahoga No. 99317, 2013-Ohio-4037, ¶ 26. If the defendant meets that burden, the court must consider

whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive character. *Manson v. Brathwaite,* 432 U.S. 98, 114, 53 L.Ed.2d 140, 97 S.Ct. 2243 (1977); *State v. Garner*, 74 Ohio St.3d 49, 61, 656 N.E.2d 623 (1995). If the pretrial procedures were not suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and the identification is admissible. *State v. Wills*, 120 Ohio App.3d 320, 324, 697 N.E.2d 1072 (8th Dist.1997), citing *United States v. Sleet*, 54 F.3d 303, 309 (7th Cir.1995).

{¶11} R.C. 2933.83 governs the administration of photo lineups and is aimed at preventing the use of unnecessarily suggestive procedures. Although R.C. 2933.83(A)(6) defines the "folder system" procedure, we have held that R.C. 2933.83 does not require the use of the "folder system" and that the "folder system" is just one of the systems law enforcement agencies may use for photo lineup identifications. *State v. Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722, ¶ 77. *See also* R.C. 2933.83(A)(6) and (D).

{¶12} Rather than mandating the use of the "folder system," R.C. 2933.83 requires law enforcement agencies that conduct live or photo lineups to adopt specific procedures for conducting the lineups. *Wells* at ¶ 78. R.C. 2933.83(B) outlines the minimum requirements for such procedures and requires the use of "a blind or blinded administrator" to conduct a live or photo lineup. The administrator conducting the lineup must make a written record of the lineup that includes all results obtained during the lineup, the names of all persons at the lineup, the date and time of the lineup, and the

sources of the photographs used in the lineup. R.C. 2933.83(B)(4); *Wells* at ¶ 78. If a blind administrator is used, the administrator is required to inform the eyewitness that the suspect may or may not be in the lineup and that the administrator does not know the identity of the suspect. *Id*.

{¶13} Although Cleveland detectives did not utilize a "folder system," this fact is not, by itself, enough to demonstrate that the photo lineup was unnecessarily unreliable. Detective Cook testified that he acted as a "blind administrator," did not know the individuals depicted in the photos, and did not know the suspect. In accordance with R.C. 2933.83(B)(5), Det. Cook made a written record of the lineup and instructed Bryant that the suspect may or may not be in the photos. Det. Cook followed the mandatory photo identification procedures when he presented the photo array to Bryant, and there is nothing in the record to indicate that the photo array was unnecessarily suggestive.

{¶14} Accordingly, the first assignment of error is overruled.

**Sufficiency and Manifest Weight of the Evidence**

{¶15} In the second and third assignments of error, Fields argues there was insufficient evidence to support his conviction and that his conviction was against the manifest weight of the evidence. Although the terms "sufficiency" and "weight" of the evidence are "quantitatively and qualitatively different," we address these issues together for the sake of economy, while ensuring that we apply the distinct standards of review to Fields's arguments. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶16} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶17} In contrast to sufficiency, "weight of the evidence involves the inclination of the greater amount of credible evidence." *Thompkins* at 387. While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. In other words, the reviewing court decides whose evidence is more believable. *Id.* In making this determination, we must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses, to determine whether, "in resolving conflicts in the evidence, the [factfinder] lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶18} Fields was convicted of having a weapon while under disability in violation of R.C. 2923.13, which provides that "no person shall knowingly acquire, have, carry, or

use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of a felony offense of violence."

**{¶19}** Fields's prior conviction is not in dispute. It is also undisputed that Bryant was shot. The material issue of fact at trial was whether Bryant correctly identified the shooter or whether he identified Fields as the shooter by mistake. The weight of the evidence supports the court's finding that Bryant correctly identified Fields.

**{¶20}** Bryant admitted he was intoxicated at the time of the shooting. Nevertheless, his testimony indicates that he was not substantially impaired and could recall the events of the night in detail. He testified that he first noticed Fields in the club when some of his friends started arguing with people in Fields's group. The argument escalated but somehow diffused without a physical altercation. Fields has a distinct appearance, standing over six feet tall and weighing over 300 pounds.

**{¶21}** Bryant's attention was directed to Fields a second time when a woman in Bryant's group exchanged words with Fields and Fields slapped her on the buttocks. This incident occurred inside the club at closing time. Bryant and the woman discussed the slapping incident, and she told Bryant to "leave it alone."

**{¶22}** Bryant last observed Fields pacing in front of their car as B.J. and Bryant were preparing to drive home. They were both concerned by Fields's behavior. B.J. stepped out of the car and asked Fields if he was alright. Although it was night, Bryant could clearly see Fields as he spoke to B.J. because the parking lot was well-lit and he was standing only 20 to 25 feet away. When B.J. re-entered the car, Bryant stepped out

and also asked Fields if everything was okay. Bryant was standing directly in front of Fields during this brief exchange. Thus, Bryant had several opportunities to view Fields's face for varying lengths of time. He also testified that he observed Fields open the door to the black van and start shooting at their vehicle.

{¶23} Fields contends Bryant's identification of him in the photo array is not reliable because he admitted to Det. Cook that he was only 75 percent sure that he identified the shooter correctly. The pictures in the photo arrays depicted male suspects with similar age, skin color, hair, and clothing etc. Under these circumstances, it is reasonable that Bryant would not feel 100 percent certain of his selection. However, other factors indicate Bryant correctly identified Fields as the shooter.

{¶24} As previously stated, Bryant had ample opportunity to view Fields's face on three separate occasions during the two and half hours they were at the club, and each incident would have made an impression. The first instance involved a potential threat of violence to Bryant's friends when Fields's group argued with them inside the club. In the second instance, Fields slapped a girlfriend's buttocks after a brief conversation. The last interaction with Fields, which occurred shortly after the slapping incident, was likely the most remarkable because Bryant and B.J. felt a threat of serious danger.

{¶25} Bryant was able to immediately identify Fields as the shooter in the first photo array even though the lineup was not presented to him for several days after the shooting. Although Bryant was medicated at the time of the identification, both the police and Bryant testified that he was coherent and was not impaired.

{¶26} Furthermore, it is more than mere coincidence that the suspect Bryant identified as the shooter admitted being present at the crime scene. All of this evidence, taken together, suggests that Bryant correctly identified the suspect who shot him. We therefore cannot say that the factfinder clearly lost its way and committed a manifest miscarriage of justice.

{¶27} The second and third assignments of error are overruled.

{¶28} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


EILEEN T. GALLAGHER, JUDGE

MARY J. BOYLE, A.J., and
TIM McCORMACK, J., CONCUR